STATE v. WILLIE SWANN.

(Filed 13 December, 1967)

1. **Homicide § 20—   Evidence held for jury on question of defendant's guilt of murder in the second degree.**

   The evidence for the State tended to show that on the morning of the homicide a salesman in the grocery store operated by the deceased observed three hams on a table and was told by the deceased that a colored man sitting nearby was there to take the hams with him, that the de-

ceased was alive when the salesman left the store and that a light green Ford station wagon was parked in front; that on the same morning a neighbor of the deceased heard unusual sounds and hollering from the store and then saw a light colored station wagon driven by a colored man leaving the premises; that deceased's body was found in the afternoon lying on the floor, with mortal wounds about his head and his clothing partially burned; that a physician found the burning to have been accomplished after the wounds were inflicted, that the deceased might have lived for some five or ten minutes but that he would have been able only to utter moans; that one ham was found in the store; that a witness saw the deceased on the same afternoon removing two hams from a light Ford station wagon, and that the defendant stated to her (and to another witness) that he went to the deceased's store to get the hams, that the building was burning when he arrived, that the deceased was on fire and hollering, "Help me, help me", and that the defendant got scared and left. *Held:* The evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of murder in the second degree.

**2. Homicide § 13—**

When the State satisfies the jury from the evidence beyond a reasonable doubt that the defendant intentionally killed the deceased with a deadly weapon, there arise the presumptions that the killing was unlawful and with malice, constituting the offense of murder in the second degree.

**3. Criminal Law § 106—**

Motion for nonsuit should be denied if there is substantial evidence tending to prove each essential element of the offense charged, and this rule applies whether the evidence is direct or circumstantial, or a combination of both.

APPEAL by defendant from *Carr, J.,* February 1967 Criminal Session of DURHAM.

Criminal prosecution on an indictment correctly charging defendant with murder in the first degree of Bee James on 20 May 1964, drawn in accordance with the provisions of G.S. 15-144.

Upon the call of the case for trial, the solicitor for the State announced in open court that he would not seek a verdict of guilty of murder in the first degree but would seek a verdict of guilty of murder in the second degree.

Defendant, who was represented at the trial by his present attorney of record, entered a plea of not guilty. Verdict: Guilty of murder in the second degree.

From a judgment of imprisonment, defendant appeals to the Supreme Court.

*Attorney General T. W. Bruton and Assistant Attorney General George A. Goodwyn for the State.*

*C. C. Malone, Jr., for defendant appellant.*

PARKER, C.J. When defendant appealed to the Supreme Court, the Presiding Judge found that he was an indigent and allowed him to appeal *in forma pauperis*. The court entered an order directing that the County of Durham furnish defendant's attorney a copy of the transcript of said trial; that the record in this case and the brief of defendant's counsel be mimeographed under the supervision of the clerk of this Court under the rules of this Court; and that the County of Durham should pay the costs of such mimeographing, thus giving this indigent defendant the opportunity to perfect his appeal and present his case to this Court in the same fashion as if he were a rich man.

The State introduced evidence; the defendant offered no evidence.

Defendant assigns as error the denial of his motion for judgment of compulsory nonsuit made at the close of the State's evidence.

The State's evidence, considered in the light most favorable to it and giving the State the benefit of every reasonable inference deducible therefrom, 2 Strong's N. C. Index 2d, Criminal Law, § 104, tends to show the following facts:

The deceased, Bee James, lived in a small house in the southern part of Durham County, the equivalent of about four and a half city blocks from King Scott Road — a main highway. The terrain was level from the highway to the house, and the house could be seen from the road. Bee James's house had an enclosed porch, and located on the right side of the porch was a small place where he sold groceries and merchandise.

Bruce Overby, a salesman of candies, crackers, peanuts, etc., arrived at Bee James's house with his truck from which he sold groceries direct about 11 a.m. on 20 May 1964. He carried groceries in to the enclosed porch and talked with Bee James. He observed three hams on a table on the left side of the porch. A colored man wearing overalls and light brown or tan shoes was there seated in a chair just inside the room. He could see his hands but did not see his face. This colored man was the only other person there. Overby remained at the residence about thirty minutes. He stated the deceased told him that "there was a man there then to take the hams with him." He observed a 1953 Ford Ranchwagon parked directly in front of the door about eight or ten feet from it. All the wheels of the Ranchwagon were of a different color, and the Ranchwagon itself was a light green color. When he left, Bee James was alive and in good health, the three hams were still on the table, and the Ranchwagon was still there directly in front of the door. Later, he saw this Ranchwagon on Ellington's used car lot. He went down to this lot with Deputy Sheriffs O'Briant and Leary on Friday following the Wednesday that he was at Bee James's house. The Ranchwagon

still had different color wheels on it. It appeared that something greasy had been inside the car; there were greasy fingerprints on the tail gate of the car.

Herbert Barbee lived on King Scott Road with his sister and on 20 May 1964 was sitting on the porch of her house, a distance of about two city blocks away from the home of Bee James. He has had two strokes of paralysis. While sitting on the porch he heard some unusual sounds between 11 a.m. and noon coming from the direction of Bee James's house. It sounded like somebody was unloading some irons. Then he heard some hollering. After he heard the noises, he saw a light colored station wagon come out from Bee James's house, and he could see that the driver was a colored man. He saw no other automobile leave James's house except the station-wagon. He did not see a truck or car of any kind go in or out of Bee James's driveway except the station wagon. He could hear the hollering, but he could not understand what was said. He reckons this went on for about thirty minutes. He heard this noise before he saw the station wagon leave.

L. J. Coleman, Sr., went to the residence of Bee James about 3:00 or 3:30 p.m. on 20 May 1964 to borrow a mule to plow some corn. He observed smoke coming out of the house. He opened the screen door and saw Bee James dead with his head burst open and his clothing burning. He went in the front door into the living room and into the bedroom. He observed the bed was on fire, and an empty five-gallon oil can was on the middle of the bed. The bed was on fire and smoking, but he saw no flames.

Walter C. Young, a deputy sheriff of Durham County, went to Bee James's house about 4:20 p.m. on 20 May 1964, in response to a call he received that there was a fire at Bee James's house. He did not know Bee James until that day. When he arrived he found Bee James lying flat on his back on the porch with his head burst open and his clothing burned practically off. The remnants of the clothing remaining on his body were still burning. Bee James was making no sound of any kind when Young saw him. Smoke was coming from the bedroom. The mattress from the bed inside the house had been removed and pulled out the back door by firemen who were there. There was an empty five-gallon oil can in the bedroom. He saw the body of Bee James moved from over a hole in the porch. He observed a ham lying on the table on the porch. At the end of the porch there was something like a concession stand which contained knick-knacks, such as potato chips, canned goods, sardines, etc. This concession stand was about five feet from the dead body. He saw no disturbance of merchandise nor signs of struggle in the concession area. He saw no signs of struggle at all.

D. R. Perry, a physician and medical examiner for the County of Durham for the past six years and stipulated by counsel to be a licensed physician and a medical expert, went to Bee James's house and examined him about 5:30 p.m. on 20 May 1964. When he arrived on the scene, Bee James's body was lying on the floor just inside the door of the enclosed porch of the home. He was dead when Dr. Perry arrived. There were four wounds on the right side of his head. Two or three were scalp wounds down to the bone, and one went through the scalp into the brain which caused his death. In his opinion, Bee James was unconscious after receiving this blow and probably died five to ten minutes later. In his opinion, after receiving the wound Bee James may have been able to moan, but he could not have called any name and would not have been conscious of what he was saying or doing. When he arrived there was a hole burned in the floor under Bee James's hips about eight by twelve inches wide, and the body had been burned. From the position of the body and the condition of the room inside the house he was of opinion that the burning was accomplished after the wounds were inflicted. He also testified that Bee James's death occurred two and a half hours before he arrived.

Edna Cole lived at the same address as the defendant on 20 May 1964. She has known defendant for a period of ten or fifteen years. She first saw defendant on that day at her brother's house about 8:30 a.m. when he took her to her mother's house to get a uniform to go to work. Defendant was driving a Ford station wagon of a light green color. She did not notice the color of the wheels. She does not recall what defendant was wearing. Defendant left her about 10:30 a.m. Thereafter, she saw defendant between 1:15 and 1:20 p.m. the same day at Dillard's store about a mile from the city limits of Durham. He was driving the same light green station wagon as he was driving earlier that day. She got into the car. She saw defendant get two hams out of the automobile and take them to a lady who lives on Morris Street. When she first got into the automobile, she asked defendant why he did not come back to take her back to school, and defendant stated he had been to Mr. Walker's and Mr. Bee James's to get some hams. He further stated that Bee James's house was on fire when he arrived, that Mr. James was on fire and hollering, and that he got scared and left. He did not tell her where he got the hams.

Gordon Strowd, Jr., knew defendant in May, 1964. On the evening of 20 May 1964 he saw defendant on Fayetteville Street with Edna Cole. Defendant was driving a light green Ford station wagon, but he did not observe the wheels. Defendant got out of the car and talked with him. During the conversation defendant told him that

he (defendant) went down to Bee James's house earlier that day, and when he got there the house was on fire and Bee James was lying on the porch burning and screaming for help. Defendant told him Bee James said, "Help me, son, help me," and defendant also told him that he (defendant) turned and left because he was scared.

Elmo Walker lives in or near Durham. Bee James lived approximately four miles or a little further from him. He knew defendant. During the day of 20 May 1964 defendant never came to his house. There are other Walkers who live in the neighborhood one of whom is his brother, Cornell Walker, who lives next door to him. He sold hams in 1964. His brother does not farm and does not sell hams but is a mechanic.

Herman Ellington operates a used car lot in Durham. In May, 1964 he sold defendant a light green 1953 Ford Ranchwagon. Also in May, 1964 defendant returned the car to his lot after telling Ellington that he was not able to pay for it. Ellington observed that all the wheels on the car were mismatched and of different colors.

For the purpose of passing upon defendant's motion for judgment of compulsory nonsuit, we consider the State's evidence in the light most favorable to it. Considering it in that light it would permit, but not compel, a jury to find the following facts: (1) Defendant had bought on time and had in his possession on 20 May 1964, the day Bee James was killed, a 1953 Ford Ranchwagon which had different colored wheels on it; (2) that on the day in question defendant's automobile was parked in front of James's house, and defendant was there when Bruce Overby arrived about 11 a.m. and he was still there when Overby left about thirty minutes later; (3) that when Overby left James's house there were three hams on a table on the enclosed porch; (4) that about 12 o'clock noon on the same day unusual noises came from James's house like somebody unloading some irons and hollering, and thereafter defendant was seen driving away from James's house; (5) that between 3:00 and 3:30 p.m. on the same day L. J. Coleman, Sr., came to James's house to borrow a mule to plow some corn and saw James lying on the floor of the enclosed porch dead and his clothes nearly burned off; (6) that about 5:30 p.m. on the day in question James's body was examined by Dr. D. R. Perry who was stipulated to be a licensed physician and a medical expert and who testified that James's body was lying on the floor of the enclosed porch of the house, that there were on the right side of his head cuts and gashes down through the scalp and one deep cut down through the skull into the brain which is the wound that caused his death five or ten minutes thereafter, that his clothes were practically burned off, that in Dr. Perry's

opinion from his examination of the dead body James became unconscious after receiving the death blow and may have been able to moan but could not have called any name, and that the burning occurred after James received the death wound; (7) that after James's death one ham was on the enclosed porch of his home, and the two other hams were in the possession of defendant in his car away from the James home; (8) that defendant's statement to Gordon Strowd, Jr., that when he went to James's house earlier that day the house was on fire, and James was lying on the porch burning and screaming for help and saying "Help me, son, help me," was not true because (a) Bruce Overby had seen him there for about thirty minutes when the house was not on fire and James was not hurt, and (b) James was unconscious and could not have talked after he received the death wound; (9) that there was no evidence of a struggle; and (10) that defendant intentionally killed James by the use of a deadly weapon inflicting a deep cut down through the skull into the brain causing death probably in five or ten minutes. The State's evidence would permit, but not compel, a jury to find that defendant intentionally killed James by a lethal blow with a deadly weapon which raises two presumptions against defendant: (1) That the killing of James was unlawful and (2) that it was done with malice. This constitutes the felony of murder in the second degree. 2 Strong's N. C. Index, Homicide, § 13.

All the evidence in the instant case is circumstantial. This Court, speaking by Higgins, J., said in S. v. Stephens, 244 N.C. 380, 93 S.E. 2d 431, which has been quoted with approval in many of our later decisions (see Shepard's Citations):

"We are advertent to the intimation in some of the decisions involving circumstantial evidence that to withstand a motion for nonsuit the circumstances must be inconsistent with innocence and must exclude every reasonable hypothesis except that of guilt. We think the correct rule is given in S. v. Simmons, 240 N.C. 780, 83 S.E. 2d 904, quoting from S. v. Johnson, 199 N.C. 429, 154 S.E. 730: 'If there be any evidence tending to prove the fact in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.' The above is another way of saying there must be substantial evidence of all material elements of the offense to withstand the motion to dismiss. It is immaterial whether the substantial evidence is circumstantial or direct, or both. To hold that the court must grant a motion to dismiss unless, in the opinion of the court, the evidence ex-

cludes every reasonable hypothesis of innocence would in effect constitute the presiding judge the trier of the facts. Substantial evidence of guilt is required before the court can send the case to the jury. Proof of guilt beyond a reasonable doubt is required before the jury can convict. What is substantial evidence is a question of law for the court. What that evidence proves or fails to prove is a question of fact for the jury."

In our opinion, and we so hold, the State's evidence in the case is sufficient to overthrow the challenge of the motion for judgment of compulsory nonsuit.

The judgment below is

Affirmed.